# IN THE COURT OF APPEALS OF IOWA

No. 19-0918
Filed August 5, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DOUGLAS JOSEPH FOSTER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Muscatine County, Stuart P. Werling,

Judge.


        The defendant appeals his conviction for murder in the first degree, claiming

the guilty verdict is not supported by substantial evidence.  **AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Maria Ruhtenberg,

Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant

Attorney General, for appellee.


        Considered by Vaitheswaran, P.J., Schumacher, J., and Blane, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2020).

**BLANE, Senior Judge.**

Following trial, a jury found Douglas Foster guilty of first-degree murder in the death of Lea Ponce. Foster appeals his conviction, claiming that the evidence at trial was insufficient to support the verdict. Specifically, Foster argues there was not substantial evidence with respect to malice, specific intent, willfulness, deliberation and premeditation, and that the evidence did not support a finding of confinement to constitute kidnapping—a predicate for the felony-murder alternative. Upon our review of the evidence, we find the jury verdict supported by substantial evidence and affirm.

## I. Scope and standard of review.

Challenges to the sufficiency of the evidence are reviewed for correction of errors at law. *State v. Albright*, 925 N.W.2d 144, 152 (Iowa 2019). The court views "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. "[W]e will uphold a verdict if substantial evidence supports it." *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018) (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *Ramirez*, 895 N.W.2d at 890). Evidence is not rendered insubstantial merely because it might support a different conclusion; the only question is whether the evidence supports the finding actually made. *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 393

(Iowa 2010). In considering a sufficiency-of-the-evidence challenge, "[i]t is not the province of the [appellate] court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005)).

## II. Procedural and factual background.

It is undisputed that shortly after midnight on January 8, 2019, Foster picked up Ponce at the Walmart in Muscatine. Foster and Ponce were acquainted, had a prior sexual relationship, and were the only two people in his truck that night. Surveillance video from the Walmart shows Ponce voluntarily got in Foster's truck. The State contends, after picking her up, Foster drove his truck north on Highway 38 at fifty-five miles per hour and intentionally pushed Ponce out of the passenger door to her death. At trial, Foster claimed she jumped. Ponce was found dead along the side of the highway. The autopsy established that she died of blunt force trauma to her head and chest consistent with a person coming out of a fast-moving vehicle and hitting and skidding on the pavement.

A reasonable jury could reach the following fact conclusions on the evidence presented at trial: A few weeks before her death, Ponce, who was a methamphetamine user, had stolen drugs and money from an acquaintance, Timothy Kriz.[1] Kriz had put out a bounty on Ponce—he would give seven ounces of methamphetamine (estimated at between $100–$300 in value) to anyone who

---

[1] The autopsy results showed Ponce had amphetamine and methamphetamine in her system when she died.

either killed or delivered Ponce to him.  Foster knew of the bounty Kriz placed on Ponce.

On January 7, Ponce felt the need to leave Muscatine and move to Cedar Rapids or Iowa City.  She contacted several people for a ride.  Foster, who was living in Marion, Iowa at the time, agreed to pick her up at the Walmart in Muscatine shortly after midnight on January 8, and give her a ride back to Cedar Rapids.  Another acquaintance, Cody Sheese, agreed to drive Ponce to the Walmart that evening.  According to Sheese, Ponce had her cell phone with her when he dropped her off at the Walmart.  He also testified that it was widely known in the Muscatine area that Kriz had put a bounty on Ponce.  Video surveillance from the Walmart showed Sheese dropping Ponce off, that she entered the Walmart, went to the restroom, and came back out.  She had a cell phone with her.

Shortly after midnight, while on his way to pick up Ponce at the Walmart, Foster had a phone conversation and then a contentious exchange of text messages with a girlfriend, Amanda, who was apparently upset that Foster was giving Ponce a ride.[2]  During this exchange, Foster wrote "yeah I'm gonna pull over and fuck her before I turn her over to get fucking beaten have to death."[3]  Video surveillance from the Walmart and another commercial business showed Ponce getting into Foster's truck at 12:33 a.m. and the truck heading north on Highway

---

[2] During the police investigation, a search warrant was obtained for Foster's cell phone.  A forensic search of the phone disclosed dates, times, and content of the use of the cell phone by Foster, including phone calls made or received, text messaging, and internet searches, all of which were submitted as evidence during the trial.

[3] At trial, and in the briefs, the parties agree that the text was a typographical error and was meant to state: "half to death."

38. Based upon the video and location of her body, it is estimated Ponce died within the next few minutes. A passerby found Ponce's body on the east side of the highway shortly before 1:00 a.m. and contacted police. The police searched the area and collected Ponce's shoes in the ditch, her purse, and contents from the purse, which included some of Kriz's credit cards, but police did not find her cell phone that she had with her.

Foster's cell phone records showed at 12:39 a.m., he sent a text on his phone to Ponce, who he had already picked up and was dead along the side of the highway, which stated: "Well you're not here and I'm tired of this bullshit." At 12:44 a.m., Foster placed two calls to Kriz and reached him on the second call. During the police investigation, a detective obtained Ponce's cell phone number from her father. The police then obtained a warrant for a "ping" from Ponce's cell phone provider to locate her cell phone. The "ping" produced a location, and police recovered Ponce's badly damaged cell phone on the bedside stand in Kriz's motel room in Iowa City.[4]

After pushing Ponce out of his truck, Foster did not take regular highways or the most direct route back to his residence in Marion. Shortly after 3:00 a.m., Foster used his cell phone to consult internet maps. Off of Highway 38 and north of Interstate 80, Foster took an unimproved Class B county road and got his truck stuck in the mud. The next day, Foster borrowed a pickup truck from his employer to go and tow his own truck out of the mud. Foster used his phone to search for a nearby car wash and washed down his truck. In the two days after Ponce's death,

---

[4] Police were unable to "unlock" Ponce's phone to obtain data from it.

Foster also used his cell phone to search for "Muscatine news," "Muscatine murder," and "Marion Police Department drones."

Using the Walmart surveillance video, the police identified the flatbed truck as licensed and belonging to Foster. Police determined he was working in Marion, Iowa. Muscatine officers travelled to Marion and obtained permission from Foster's employer to search the building, which included where Foster was staying. During the search, an officer found Foster hiding in the attic under the insulation. Foster stated he had a warrant out for his arrest in Texas as the reason for his hiding. Foster had also called the Muscatine police earlier in the day and left a message, but the officers were not aware of this.

The police also obtained a search warrant to seize and search Foster's truck, which was located behind his employer's building. Although the truck had been washed, mud was still observable. Under the seat of the truck, they found a pair of zip ties that were fashioned into handcuffs. Foster also provided the police with his cell phone, for which they later obtained a search warrant. A police detective interviewed Foster after he was found hiding. Foster acknowledged picking up Ponce at the Muscatine Walmart but claimed that after she asked for some meth and he did not have any, she demanded to get out of his truck. Foster told the detective he complied and stopped and let her get out and the last he saw she was standing on the side of the road.[5] When the detective suggested that

---

[5] The medical examiner who performed the autopsy of Ponce testified that the injuries he observed would not have been consistent with her being struck by a moving vehicle while she was standing or walking along the roadway.

Ponce had jumped from his moving truck, Foster denied that happened. Foster was not immediately arrested.

After police searched Foster's cell phone and found the text messaging that contradicted his statement to the detective, and zip tie handcuffs were found in his truck, Foster was arrested and charged with Ponce's murder. He was held in the Muscatine County jail, where he came to meet Rodney Foutch, an inmate being held on federal charges.[6] During their time in jail together, Foster gradually talked to Foutch more and more about his charges. Foutch told his wife what Foster had been telling him, and Foutch's wife contacted the Muscatine Police, who then interviewed Foutch.

Foutch revealed to the police that Foster had told him several stories about what happened, initially that Ponce jumped from his moving truck. Eventually, Foster told him that he intended to first have sex with Ponce and then deliver her to Kriz; that he was aware of the bounty. Foster later told Foutch that Ponce saw on his cell phone that there was a bounty on her, wanted out of the truck, and began to open the door. Foster told Foutch that he struck her in the back of the head with the barrel of his .40 caliber hand gun to keep her from getting out. Foster indicated that they struggled and he finally pushed or kicked Ponce out of his moving truck and felt the back tires bump, like he had run over her. Foster also said he had buried the .40 caliber gun. Foster also laughed that the police were

---

[6] Foutch was federally charged with possession with intent to distribute methamphetamine and felon in possession of a firearm.

wrong when they thought he had hit Ponce in the head with the hammer they had found in his truck since he had hit her with the gun.[7]

Foutch testified at trial to these discussions with Foster.[8]  To corroborate Foutch's testimony, the prosecution established that Foutch would not have known any details about a .40 caliber gun or a hammer except to learn them from Foster, since the police had not made public any details of Ponce's death, her injuries, or what had been found during the investigation.  Further, the State's evidence included video from the Muscatine jail showing Foutch and Foster together in the jail pod, and a portion of the video showed Foster making a motion like he was striking someone.  Foutch testified this was Foster demonstrating how he had struck Ponce with the gun.

The police searched for the .40 caliber gun but could not find it.  However, in searching Foster's cell phone, they came across recent photographs of Foster holding a .40 caliber gun.  Also, Foster's employer turned over to police a .40 caliber ammunition clip that was found in the company pickup truck after it was loaned to Foster to pull his own truck out of the mud—additional evidence corroborating Foutch's testimony.

On January 25, 2019, the State charged Foster with murder in the first degree, in violation of Iowa Code section 707.2(1)(a), (b) (2019), a class "A" felony. It alleged two alternatives, premeditated murder or felony murder in the course of

---

[7] The medical examiner testified that Ponce had contusions to the back of her skull, but he could not determine if these were caused by being hit with the barrel of a gun or from striking her head on the road pavement.
[8] Foutch was cross-examined whether he was going to receive any benefit in his federal sentencing for testifying for the State against Foster, which he denied.

the public offense of kidnapping. Foster pled not guilty, and the jury trial commenced on April 8. During the trial, the court denied Foster's motion for judgment of acquittal made at the close of the State's case as well as at the close of all of the evidence.

The court instructed the jury on murder in the first degree based upon the two alternatives of premeditation as well as murder in perpetration of a public offense, kidnapping. The court also gave the jury a single verdict form as to murder in the first degree, instructing the jury that it could find Foster guilty of that charge under either of the State's alternative theories. The jury returned a verdict of guilty of murder in the first degree, not specifying whether it was based on the premeditation theory or the felony murder/kidnapping theory. Foster did not testify at trial. He appeals the verdict.

**III. Discussion.**

**A. Malice aforethought, specific intent, willfully, deliberation and premeditation.**

On appeal, Foster first argues that the State failed to present substantial evidence that he inflicted blunt force injuries on Ponce, or that he acted with malice aforethought, willfully, deliberately, premeditatedly, and with specific intent to kill Ponce. The trial court gave the jury the following marshalling instruction for first-degree murder:

> The State must prove all of the following elements of Murder in the First Degree:
> 1. On or about January 8, 2019, the defendant inflicted blunt force injuries to Lea Ponce's head and chest.
> 2. Lea Ponce died as a result of the blunt force injuries to her head and chest.
> 3. The defendant acted with malice aforethought.

4. The defendant acted under one of the following circumstances:

a. willfully, deliberately, premeditatedly, and with the specific intent to kill Lea Ponce; or

b. while participating in the public offense of kidnapping.

If the State has proved all of the elements, the defendant is guilty of Murder in the First Degree. If the State has failed to prove any of the elements, the defendant is not guilty of Murder in the First Degree and you will then consider the charge of Murder in the Second Degree as explained in Instruction No. 28.

In Jury Instruction No. 21, the court defined for the jury the words "willful," "deliberate," and "premeditate," and instructed that "[d]eliberation and premeditation need not exist for any length of time before the act." On appeal, Foster does not challenge the court's jury instructions, and we observe they were correct statements of the law.

> Deliberation and premeditation may be shown by circumstantial evidence in one or more of three ways: (1) evidence of planning activity of the defendant which was directed toward the killing; (2) evidence of motive which might be inferred from entire relationships between defendant and victim; and (3) evidence regarding the nature of the killing.

*State v. Blair*, 347 N.W.2d 416, 421 (Iowa 1984) (citations omitted).

The court also instructed the jury on malice. "Malice aforethought is a fixed purpose or design to do some physical harm to another that exists before the act is committed." *See State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003) (quoting *State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002)). Malice also does not need to exist for any particular length of time. *Id.*

The court also defined "specific intent" as doing an act with a specific purpose in mind. That instruction also informed the jury that

> Because determining the defendant's specific intent requires you to decide what the [d]efendant was thinking when an act was done, it is

seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine the defendant's specific intent. You may, but are not required to, conclude a person intends the natural results of his or her acts.

In determining specific intent, the jury had substantial evidence of facts and circumstances of Foster's conduct surrounding the act. Admissions may be implied by the conduct of the defendant subsequent to a crime when such conduct indicates a consciousness of guilt. *State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) (citing *State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993)).

Based upon our review of all of the evidence presented, that evidence was sufficient to support a jury finding that Foster inflicted blunt force injuries and did so with malice, willfully, deliberately, and with specific intent to kill Ponce. It is undisputed that Ponce died by exiting Foster's fast moving truck on Highway 38. The jury could find that Foster had the specific intent to cause Ponce blunt force injuries that would result in her death by pushing or kicking her out of the truck as it proceeded down the paved highway at fifty-five miles per hour.

It was for the jury to determine if Ponce leapt to her death or if Foster pushed or kicked her out of his truck. From the evidence, the jury could well find that when Foster went to pick up Ponce, he was armed with a .40 caliber hand gun. He had zip-tie handcuffs in his truck. He was acquainted with Kriz and was aware of the bounty Kriz had put out on Ponce—which could be earned by either killing Ponce or delivering Ponce to Kriz; therefore Foster had a motive. Before picking up Ponce, he expressed in a text his intention of delivering Ponce to Kriz and that she would be beaten half to death.

The jury could find Foster's consciousness of guilt was exhibited in numerous ways. Within minutes of Ponce's death, he sent a cover-up text message to her phone claiming that she was not at the Walmart. This was obviously false because surveillance cameras show him picking Ponce up. He placed two calls to Kriz. He took a circuitous route to return to his residence and got his truck stuck in the mud. After retrieving the truck, he washed it to eliminate blood or DNA evidence. He buried his .40 caliber gun. He conducted internet searches regarding "Muscatine murder." He told the detective that Ponce had demanded to be let out of the truck and he complied, and when the detective asked if Ponce had jumped from his truck, he specifically denied this happened. This is all consistent with what could be called a guilty state of mind.

In addition, the jury had Foster's admissions to Foutch, which included that he struck Ponce in the back of the head with his handgun, then pushed her out of the truck. Based upon Foutch's testimony, the jury could also have concluded that once Ponce learned from Foster's cell phone of the bounty on her, that Foster decided to kill her rather than take her to Kriz. With all of this evidence, the jury was free to reject Foster's claim at trial, that was based upon one of the stories Foster told Foutch, that Ponce jumped from his moving truck.

**B. Perpetrated in the commission of the public offense of kidnapping.**

Foster claims that there was insufficient evidence that he was kidnapping Ponce when he caused her death. Foster's argument is premised on the assertion that Ponce voluntarily got into his truck at the Walmart and that there is no evidence that he restrained her. Further, Foster argues that if we find sufficient evidence regarding a willful, deliberate, and premeditated murder but find insufficient

evidence for the kidnapping felony murder alternative, he is entitled to a new trial because the jury returned a general verdict and did not specify under which alternative it was finding him guilty. *See State v. Williams*, 674 N.W.2d 69, 71 (Iowa 2004).

The trial court instructed the jury as follows regarding the public offense of kidnapping:

> Public offense of 'kidnapping' means a crime where:
> 1. A victim is confined or removed by another person.
> 2. The person did so with the specific intent to:
>     a. inflict serious injury on the victim; or
>     b. secretly confine the victim.
> 3. The person knew he did not have the consent of the victim to so act.

The jury was also instructed regarding confinement:

> A person is "confined" when her freedom to move about is substantially restricted by force, threat or deception. The person may be confined either in the place where the restriction began or in a place to which she has been removed.
> No minimum time of confinement or distance or removal is required. It must be more than slight. In determining whether confinement or removal exists, you may consider whether:
>     a. The risk of harm to the victim was substantially increased;
>     b. The risk of detection was substantially reduced; or
>     c. Escape was made substantially easier.

Foster's argument fails for several reasons. First, there was substantial evidence from which the jury could find that Ponce got into Foster's truck by deception. She thought he was going to give her a ride to Cedar Rapids. The jury could also conclude Foster's text message to Amanda established that he had knowledge of the bounty on Ponce—which could be earned by killing her or delivering her to Kriz. The text further indicated that he was going to deliver Ponce to Kriz. The jury could also reasonably believe Foster also had prepared for a

kidnapping—he had his .40 caliber handgun and zip-tie handcuffs to restrain Ponce.

If a victim's consent to confinement or removal is obtained by deception, then the confinement element has been met. *State v. Osborn*, 455 N.W.2d 292, 293–94 (Iowa Ct. App. 1990). "[C]onsent obtained by fraud or deceit negates the consent, or is not consent at all." *Id.* at 294. The jury could rightly infer that had Ponce known Foster's true intentions before she got into his truck at Walmart, she never would have done so, and that her willingness to get into his truck was the result of his deception. As such, the evidence was sufficient to show that Foster kidnapped Ponce before he killed her.

In addition, there was evidence of actual confinement. According to Foutch's testimony, while in the truck, Ponce learned of the bounty and tried to leave the truck and get away from Foster. The two physically fought and this culminated in Foster striking Ponce in the back of the head with his handgun to prevent her from leaving his truck. This evidence was sufficient to show Foster confined Ponce. *See State v. Maddox*, No. 10-0831, 2011 WL 2075421, at *6 (Iowa Ct. App. May 25, 2011) (discussing cases that found sufficient evidence of kidnapping when "a reasonable jury could find . . . that the movement and confinement . . . had significance independent of charges" including "lessening the risk of detection, or significantly facilitating escape"). The restraint does not have to be for any particular length of time, but the jury could conclude Foster confined Ponce in the moment of hitting her on the head, even if she successfully opened the truck door.

Since we find either of the State's theories establishing first-degree murder is supported by substantial evidence, the general verdict found by the jury need not be revisited.[9]

## C. Conclusion.

Having reviewed all of the evidence, we find there is substantial evidence to support the jury's verdict.

**AFFIRMED.**

---

[9] We note that Foster was sentenced and judgment was entered on May 31, 2019. Iowa Code section 814.28 (2019), which became effective on July 1, 2019, provides:

> When the prosecution relies on multiple or alternative theories to prove the commission of a public offense, a jury may return a general verdict. If the jury returns a general verdict, an appellate court shall not set aside or reverse such a verdict on the basis of a defective or insufficient theory if one or more of the theories presented and described in the complaint, information, indictment, or jury instruction is sufficient to sustain the verdict on at least one count.

Relying on *State v. Macke*, 933 N.W.2d 226, 235 (Iowa 2019), we held in *State v. Warren*, since section 814.28 lacks language clearly indicating a legislative intent for retroactivity and it did not exist at the time judgment of conviction was entered against the defendant, it did not apply to the appeal. No. 19-0267, 2020 WL 2488183, at *2 (Iowa Ct. App. May 13, 2020), *further rev. granted* (Iowa Jul. 18, 2020) (No. 19-0267). Therefore, section 814.28 is not applicable to this appeal.